L1J1MATC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MATTEL INC.,

4              Plaintiff,

5        v.                              20 Civ. 11075 (NRB)

6  THE ENTITIES DOING BUSINESS AS
   GOODMENOW, et al.,
7
             Defendants.                 Temporary Restraining
8                                        Order
                                         Oral Argument
9                                        (Via Teleconference)
   ------------------------------x
10                                       January 19, 2021
                                         5:06 p.m.
11
   Before:
12
                   HON. NAOMI REICE BUCHWALD,
13
                                         District Judge
14
                        APPEARANCES
15
   DUNNEGAN & SCILEPPI LLC
16      Attorneys for Plaintiff
   BY:  WILLIAM I. DUNNEGAN, ESQ.
17
   DGW KRAMER LLP
18      Attorneys for Defendants
   BY:  KATHERINE BURGHARDT KRAMER, ESQ.
19      JACOB CHEN, ESQ.

20

21

22

23

24

25

L1J1MATC

1     THE COURT:  Good evening.  This is Judge Buchwald.

2  And we're having this call because of the request by the

3  defendants to modify the attachment order that I previously

4  signed.

5     So let's just begin by taking attendance.  Who's on

6  the phone for the plaintiff?

7     MR. DUNNEGAN:  Your Honor, Bill Dunnegan for Mattel.

8     THE COURT:  Okay.  And who's on the phone for the

9  defendant?

10     MS. BURGHARDT KRAMER:  This is Katie Burghardt Kramer

11  for the defendants, and my colleague Jacob Chen is also on the

12  line.

13     MR. CHEN:  Good afternoon, your Honor.

14     THE COURT:  All right.  Okay.  I guess based on your

15  letters, it's my understanding that the defendants have agreed

16  at this time, and without prejudice to a later application

17  concerning the TRO and the attachment, that they've agreed not

18  to object to PayPal holding $2.8 million; is that correct?

19     MS. BURGHARDT KRAMER:  That's correct, your Honor.

20     THE COURT:  Okay.  And I guess one question to

21  Mr. Dunnegan is:  Why 2.8, given that the maximum statutory

22  damages would be considerably less?

23     MR. DUNNEGAN:  Your Honor, this is Bill Dunnegan.  The

24  answer to that question is that the maximum statutory damages

25  would be $2,150,000, plus under both statutes -- I believe it's

L1J1MATC

probably a little bit stronger under the Trademark Act -- the

attorney's fees are virtually mandatory.  And to run up a bill

of 500 or $650,000 in a case which is going to be as hotly

contested as this may be very, very reasonable.  In any event,

that was the number that --

THE COURT:  Who decides what's reasonable?  Me, right?

MR. DUNNEGAN:  That is correct.

THE COURT:  Don't spend it yet.

MR. DUNNEGAN:  Well, no, your Honor, of course not.  I

mean, it's just a lodestar amount.

THE COURT:  Okay.

MR. DUNNEGAN:  Now there's one other point I would

like to make, and that is, the 2.8 is their number.  The 2.8

that I am talking about is $2.8 million free and clear of all

liens and encumbrances, which could be used to satisfy a

judgment.  The 2.8 that they are talking about is subject to

liens and encumbrances of PayPal, which would represent PayPal

claims or claims of customers of PayPal.  There's absolutely no

record here of how much of the money at PayPal is subject to

PayPal's existing liens.  I mean, if we look at PayPal's

existing liens, which defendants should certainly know the

amounts of, there may be nothing here at PayPal, which is

attached, which is not subject to a PayPal lien.  And if that

money is -- if the lien is exercised, then there's nothing here

from which to collect the judgment.

L1J1MATC

1          THE COURT:  And why is it that you think that the

2     attachment is not a more effective or powerful device than a

3     customer claim for a refund?

4          MR. DUNNEGAN:  Yes, because our ability to attach at

5     PayPal is no greater than the value of the defendant's assets

6     at PayPal.  And if PayPal has a prior security interest in that

7     money as a result of its customer agreement, then at least

8     PayPal is asserting that its lien is senior, and we don't want

9     to get in a fight with PayPal about that.

10          THE COURT:  And how much at the moment is the total

11     amount of the money that relates to defendant's accounts at

12     PayPal that have been attached?

13          MR. DUNNEGAN:  If that's directed to me, your Honor,

14     PayPal has only notified us that there is $2.7 million,

15     roughly, which has been attached, and that was as of

16     January 7th.  We have learned only through the defendant's

17     counsel that PayPal has apparently identified three other

18     claims which have roughly $2½ million in them.  We've never

19     received any notice from PayPal that that additional money

20     exists.

21          THE COURT:  You haven't called to PayPal, your pals at

22     PayPal?  You told me at one point that you had a relationship

23     with the attorneys at PayPal, from your prior legal work,

24     right?  Because remember you told me that you would be able to

25     get them over New Year's weekend?

L1J1MATC

1          MR. DUNNEGAN:  Yeah, yeah, and I think --

2          THE COURT:  Have you called some of your, as I said,

3    pals at PayPal to inquire of them whether these other accounts

4    that the defendants have disclosed in fact exist?

5          MR. DUNNEGAN:  No.

6          THE COURT:  And whether PayPal has treated them as

7    subject to the Court's order?

8          MR. DUNNEGAN:  Okay.  I don't have any reason to

9    believe that the defendant's counsel are in fact saying

10   something which is false.  I accept that.

11         THE COURT:  Well, but don't you want to know from

12   PayPal how much money of the total amount in the various

13   accounts is under attachment?

14         MR. DUNNEGAN:  Yes.  Okay.  That's an interesting

15   question, but the real question, which I cannot know the answer

16   to because I'm sure PayPal will say it can't determine it at

17   the moment or it will not tell me if it can determine it, would

18   be how much of it is not subject to PayPal's liens.  That's the

19   $64,000, or more, question.

20         THE COURT:  If PayPal had $50 million of the

21   defendant's money in accounts and your maximum claim is, let's

22   say, your 2.8, is there really a concern, seriously, that there

23   could be liens that are over $40 million?

24         MR. DUNNEGAN:  Yes, your Honor, because --

25         THE COURT:  Why?

L1J1MATC

1     MR. DUNNEGAN:  Let me explain why.  The $40 million

2     which PayPal would be holding in your hypothetical would be the

3     result of customers paying PayPal and PayPal holding the money.

4     If the customers never received the merchandise from the

5     defendant, the customers would have the ability to go back to

6     PayPal and say, I did not receive this, I'm entitled to my

7     money back, and PayPal would have to give them back if it

8     obeyed the law.  Now you could make an argument that one at a

9     time, customers are not going to do that.  But you could also

10    make the argument, based upon reading some of these comments

11    which were at the PayPal community forum, that somebody could

12    very easily bring a class action against these people and

13    the --

14         THE COURT:  Sir, do you have a clue, seriously, of how

15    long it takes for a class action to get to the point of

16    judgment?

17         MR. DUNNEGAN:  Oh, absolutely.

18         THE COURT:  Really, come on.  That's what we do in the

19    Southern District.  And this case will be over well before any

20    judgment in a class action.

21         MR. DUNNEGAN:  Right, but see, your Honor, the class

22    action lawyer is subject to the same attachment statute that I

23    am --

24         THE COURT:  Oh, no.

25         MR. DUNNEGAN:  -- so they could bring -- a class

L1J1MATC

1    action could be brought in New York State Court or any of the

2    other courts in the United States.

3              THE COURT:  You don't think that first in time is

4    first in right here, that this Court's order isn't first in

5    time and first in right?

6              MR. DUNNEGAN:  I don't think so if that's for a refund

7    of the money which should not have been gotten to PayPal in the

8    first place because there was not a delivery of the product.

9    For example --

10             THE COURT:  This is so unrealistic.  This is as if the

11   entire business of the defendants is so ephemeral that we've

12   just got thousands and thousands and thousands of people

13   ordering from the defendant not getting their merchandise and

14   seeking returns on PayPal, but somehow or other, there are

15   millions of dollars at PayPal.  I mean, yes, your arguments are

16   fascinating theoretically, but they seem awfully theoretical to

17   me.

18             MR. DUNNEGAN:  Well, your Honor, I don't know if you

19   had an opportunity to look at it, but the comments that we sent

20   in, filed electronically as Exhibit B to my last letter,

21   demonstrate -- I've never seen anything like this.  There are

22   hundreds, literally hundreds of comments from people saying,

23   this is a scam, we did not receive the merchandise we were

24   promised.  Now as an absolute number, maybe a few hundred or a

25   couple hundred wouldn't make any difference, but these were the

L1J1MATC

1   people who were taking the time to comment publicly on PayPal,

2   and there's no defense here on the merits.  The same thing

3   happened to us that happened to all of these other people who

4   are commenting that they did not get the merchandise.  Now --

5           THE COURT:  Well, that's not what happened to you,

6   right?

7           MR. DUNNEGAN:  Yes, it is what happened to us, your

8   Honor.  We paid for the merchandise.  Their website said it was

9   delivered, and it was not delivered.  Now if you want to take

10  that a step farther and say, oh, gee, is that just something

11  that went wrong in the delivery of the mails?  And I agree that

12  there are sometimes problems with the delivery of the mails.

13          THE COURT:  Excuse me, since I did not assume that

14  that was the fact.  How many times did you order one of these

15  dolls?  Just once?

16          MR. DUNNEGAN:  We made one order --

17          THE COURT:  To get jurisdiction.

18          MR. DUNNEGAN:  -- just to make sure they were actually

19  somebody who would take our money rather than just a fishing

20  site.  And jurisdiction is certainly part of it.

21          THE COURT:  Yes.  But you never really tried to

22  actually get a doll?

23          MR. DUNNEGAN:  We did.  We paid for a doll.  They told

24  us --

25          THE COURT:  I know.  But you never physically got a

L1J1MATC

1    doll?

2             MR. DUNNEGAN:  That is correct.

3             THE COURT:  And you never tried again?

4             MR. DUNNEGAN:  No, because --

5             THE COURT:  You don't think your case would be

6    stronger, theoretically?

7             MR. DUNNEGAN:  It might be, but let me get you to a

8    specific page of a specific document we filed.

9             THE COURT:  You're going to have to -- it takes an age

10   to pull up your --

11            MR. DUNNEGAN:  I can read it to your Honor just for

12   the record.

13            THE COURT:  I'd rather look at it, okay, and then you

14   can read it into the record, okay?

15            MR. DUNNEGAN:  Sure.

16            THE COURT:  I'm not sure I'm going to be able to find

17   it.  Do you know what page of your ECF filing it is?

18            MR. DUNNEGAN:  Yes, I do, your Honor.

19            THE COURT:  What is it?

20            MR. DUNNEGAN:  It's page 5 of 13 in Document 24-2.

21            THE COURT:  Okay.  I'm sorry.  I don't know that I can

22   find that.  That's not the way it's been sent to me.  I'm

23   sorry.  Maybe you should just read it, because I don't know if

24   I can find it.

25            MR. DUNNEGAN:  Your Honor, I did send a paper copy in,

L1J1MATC

1    which was delivered earlier today.

2                THE COURT:  But I'm not at the office.

3                MR. DUNNEGAN:  I understand.  Okay.  It says -- this

4    is one page of the offering page from a feelitnice.com, and

5    then there are some further delineations.  "We plan to sell

6    1,000 sets, until now, we have sold 500 sets.  Time is limited.

7    First come, first served."  And it continues.  Now the

8    important thing about this is not that they say that they've

9    sold 500 sets of a product, but it's 500 sets that they claim

10   to have sold of a very specific collector's item of doll.  They

11   are proposing to sell the "Day of the Dead" doll from 2019 and

12   2020 for $35 apiece.  Now if you are Mattel's best customer,

13   you cannot buy that doll for less than $35 apiece.  That's for

14   the 2020 doll.  For the 2019 doll, Mattel is completely sold

15   out, and the only trading of those dolls is by collectors on

16   the internet.  And earlier today I put into, I think it was

17   Google, "Mattel 'Day of the Dead' 2019 doll," and a whole bunch

18   of dolls come up on eBay which are offered for sale, and they

19   were offered for sale between $300 apiece and $500 apiece.  So

20   the idea that this company is selling, actually selling genuine

21   dolls in this quantity for this price just cannot stand.  It

22   can't withstand the smell test.  There's something going on

23   here which is wrong.  Now it could be that they're making a

24   counterfeit doll and they're selling that as a genuine Barbie

25   doll and you know that when you get it, but based upon all this

L1J1MATC

1    information from paypal-community.com, it appears that what

2    they are doing is taking the order, keeping the money at

3    PayPal, and not delivering the product, and then telling the

4    people at PayPal, with some false information, that the product

5    has been in fact delivered to the customer and PayPal is

6    releasing the money.  There are so many comments out there on

7    these pages from paypal-community.com that it's overwhelming.

8            THE COURT:  Okay.  And your theory is that despite

9    what you are contending is this massive flood of complaints,

10   that PayPal doesn't care at all about its reputation so that

11   PayPal is releasing the money to the defendants and somehow not

12   satisfying the PayPal customers and that that's what's going

13   on?  Or is there another business model where the customer

14   gives the money to PayPal, PayPal holds it, and then doesn't

15   release it to the defendants, which isn't a good business

16   model?  I mean, your theory is that PayPal is more than

17   delighted to participate in what you're alleging is defendant's

18   across-the-board scam, that PayPal doesn't care?

19           MR. DUNNEGAN:  Your Honor, if you look at the

20   paypal-community.com website, we put in this paper, about 150

21   pages or so, and this is not just some random site off the

22   internet; this is a PayPal-owned site.

23           THE COURT:  I get it.

24           MR. DUNNEGAN:  Okay.  PayPal is allowing these people

25   to post that information on that site, and something here is

L1J1MATC

1    not making 100 percent sense because I don't think that PayPal,

2    you know, itself is a racketeering enterprise, but something is

3    going wrong, and we don't know what it is, and defendant isn't

4    telling us what it is.  I mean, it would be very easy for

5    defendant to say, oh, we're such a big operation, we made

6    $19 million a year in the fourth quarter of 2020, we'll just

7    post a bond for the $2.8 million that we say should be held.

8    Problem solved.  Or they could tell PayPal to wire $2.8 million

9    and the Court would hold it, as opposed to having PayPal hold

10   it.  And I don't see how the defendant would be prejudiced by

11   that in any respect, except they can't do it, because all the

12   money is being liened by PayPal; it's held as cash collateral

13   for claims which are asserted against PayPal.  That's the only

14   thing that makes sense.

15         THE COURT:  So PayPal is holding the money and they

16   don't release it to the defendants, on your theory.

17         MR. DUNNEGAN:  That is correct.  And your Honor, don't

18   believe me; don't take my word for it.  If you look at the

19   second page of the letter that the defendant submitted on

20   January 18th -- and I can wait or I can read.  You tell me.

21         THE COURT:  Is that their reply letter?

22         MR. DUNNEGAN:  It is.

23         THE COURT:  That I can find.

24         MS. BURGHARDT KRAMER:  Your Honor, if I may, I'm happy

25   to address many of these points at whatever point you want us

L1J1MATC

1    to.

2             THE COURT:  I assure you, you will get your chance.

3             MS. BURGHARDT KRAMER:  Thank you.

4             THE COURT:  Okay.  I have the January 18th letter up.

5    What page do you want me to look at?

6             MR. DUNNEGAN:  Page 2 of 3.

7             THE COURT:  Okay.  I got it.

8             MR. DUNNEGAN:  The first -- in the third full

9    paragraph, the one that begins, "Plaintiffs ask defendants,"

10   and if you could look at the last two sentences of that

11   paragraph where it says, "During normal operations, defendants

12   are required to maintain both a fixed deposit and a revolving

13   deposit in their PayPal accounts.  These deposits are

14   substantial, and they are required under the standard terms of

15   their agreement with PayPal."  Now what that leaves open is,

16   well, they say "substantial."  What does that mean in terms of

17   dollars?  Are there more liens on these 5 or so million dollars

18   than $5 million?  We just don't know.  They know.  They're not

19   telling us.

20            THE COURT:  Okay.  Why don't we hear from defendant's

21   counsel.

22            MS. BURGHARDT KRAMER:  Thank you, your Honor.  This is

23   Katie Kramer for the defendants.

24            I'd like to bring us back to the point of what we're

25   asking for here.  The harm that's being inflicted on defendants

L1J1MATC

1    is pretty soon going to be irreparable if there's no

2    modification.  The business has been shut down.  The defendants

3    rely on the PayPal account to operate their business.  They are

4    unable to do so at this time.  We've put the plaintiff on

5    notice that if this continues, we do intend to seek damages for

6    that harm.  The harm is quickly accruing.  In normal course of

7    operations, there would be a lot of activity in these accounts.

8    There would be a lot of commerce and there would be a lot of

9    funds coming through.  Our client is being denied that

10   opportunity as a result of this order, and we're here,

11   really -- it's an urgent, desperate plea for some sort of

12   modification.  The reason that we -- go ahead.

13            THE COURT:  Well, plaintiff's counsel is not saying, I

14   want to keep all of the money that is at PayPal under

15   restraint.  What he's saying is, you know, working from what

16   admittedly is a kind of a maximum number of 2.8, all he's

17   saying is, I want to be sure that if I win this case, the money

18   will be there, and since I, the plaintiff, have succeeded in

19   persuading a court to give me this attachment order and I found

20   considerable funds at PayPal, I'm not seeking to keep them all

21   there, I am just seeking to be secure to the tune of 2.8 for

22   now, and then, you know, whatever the defendant's challenges

23   may be to the attachment order *ab initio* beyond the amount, or

24   we can litigate that, and we shall.  So all he's asking is,

25   given that he doesn't have full access to the situation at

L1J1MATC

1    PayPal, he does not know what part of these funds are subject

2    to some preexisting lien by PayPal itself, at a minimum, he

3    says, for now, I just want to know that I'm good up to a

4    certain amount, and is there some reason why, if there are

5    multiples of that at PayPal, the defendant cannot offer

6    plaintiff, and a sense the Court, the certainty that the 2.8 is

7    available, at least for now?

8            MS. BURGHARDT KRAMER:  To start out with, I want to

9    make it clear that the reason that we said 2.8 was that we

10   didn't want to fight over the number.  We knew that 2.8 was a

11   number that was acceptable to the plaintiff.

12           THE COURT:  Right.

13           MS. BURGHARDT KRAMER:  And what we want is we just

14   need this to be cabined for now so that we can resume

15   operations.  We picked 2.8 because we knew there wouldn't be a

16   fight over that number.  In reality, the damages here are low

17   and, you know, 2.8 is really a "pie in the sky" number for

18   where the damages could end up in this case.  I don't think

19   it's a realistic number.  When we file papers later this week,

20   we intend to put in some more information about, you know, the

21   scope here.  You know, we heard plaintiff's counsel talk about

22   the potential for 500 sales.  If, in his view, there were 500

23   sales of this product, maybe 10 percent profits on the product

24   that were sold for about $30 each, then, I mean, the profits

25   under that calculation are minuscule.

L1J1MATC

1      THE COURT:  Listen, I'm not questioning that 2.8 is,

2  if you were to bet, unlikely to be the outcome here, and I'm

3  not saying that it's the right number, but my understanding was

4  that, for the reasons you said, for now, in effect, you're

5  willing to humor the plaintiff so that the remainder of their

6  attached funds could be released.  I understand.  I'm not

7  taking your position as anything other than practical, and I'm

8  not taking it as some kind of concession that, you know, 2.8 is

9  where this case is going to wind up.  But his point is,

10 whatever the number was --

11     MS. BURGHARDT KRAMER:  Well, your Honor, it's

12 speculation.  It's just speculation.  As your Honor pointed

13 out, plaintiff's counsel has apparently made no effort to

14 figure out if there are liens.  The idea of the lien is based

15 on some boilerplate language.

16     I also want to bring this back to the point that

17 Yokawa Network is a successful, thriving e-commerce business,

18 or at least it was up until this attachment order.  If we're

19 able to resume operations through these PayPal accounts, there

20 will be additional funds.  Yokawa Network is collectible.  This

21 isn't a fly-by-night operation with $5,000 in a bank account

22 somewhere.

23     THE COURT:  The point is, I mean, what is the

24 reluctance to put the money up in a way that there's no

25 question that it will be available?

L1J1MATC

1          MR. CHEN:  So, your Honor, if I may jump in here

2     briefly.  This is Jacob Chen on behalf of defendants.

3          So the accounts here, the PayPal accounts, are all

4     Hong Kong accounts.  They were opened in Hong Kong.  One of the

5     arguments we plan to raise in our opposition papers is that

6     they're not subject to attachment because they are not in New

7     York.  So what the plaintiffs are trying to do is they're

8     trying to get from the Court a relief they're not entitled to,

9     which is having the money withdrawn from a Hong Kong account

10    and put into a New York account to give them *in rem*

11    jurisdiction.  They're using the attachment motion to acquire

12    *in rem* jurisdiction over assets that they simply don't have

13    jurisdiction over.  Right now, for the accounts to be left in

14    their Hong Kong PayPal account, we'll present the argument to

15    the Court -- we'll explain to the Court why they're not subject

16    to attachment, and I think that's fine and there's still the

17    full 2.8 million in it, which is, our position is, way above

18    and beyond what they would actually be entitled to, but

19    certainly is the maximum.

20          And regarding the argument about a lien, this isn't

21    just basically plaintiff's pure speculation.  It is actually

22    impossible for us to prove a negative.  In order for us to

23    prove that there is no lien, we would need to give plaintiffs a

24    time machine and have them watch our accountants deal with

25    every single book and record entry and to show them every

L1J1MATC

single transaction for all the products that the company sells

and allow them to look over it, and it's impossible for us to

prove that the company has no liens whatsoever or the liens

don't equal any certain amount, which is why, if the plaintiffs

are seeking attachment, they bear the burden of telling the

Court why this $2.8 million in the PayPal account is not

enough.  And they try to meet that burden by bringing some

hearsay, inadmissible testimony from some reviewers, who could

very well be false.  It is a very common practice in the

e-commerce industry for competitors to create and generate

false reviews in order to shut down and make life difficult for

competitors.  They have not brought in any affidavits, they

have not reached out to any of these alleged reviewers, they

have not presented the Court with any admissible evidence of

one, and not to mention of the tens of thousands that they

would need to show that there is actual or real risk that the

money in the PayPal account, assuming that it is in fact

subject to jurisdiction, would not -- it would not be possible

for that money to disappear all at once and leave the plaintiff

unable to satisfy a judgment.

THE COURT:  So you're saying that the PayPal accounts

are in effect a bank account in Hong Kong.

MR. CHEN:  That's correct, your Honor.  They were

opened by the defendants with PayPal in Hong Kong, as a Hong

Kong PayPal account.  And the address on the PayPal account is

L1J1MATC

1    also in Hong Kong, which the plaintiff can verify.  They have

2    received records from PayPal, and they can confirm that the

3    accounts all have a Hong Kong address on it.

4            THE COURT:  And when an American consumer purchases a

5    product that the defendant has placed for sale on the internet

6    and they pay for it through PayPal, the money goes directly

7    into a Hong Kong account, doesn't pass through the United

8    States?

9            MR. CHEN:  I think there are certain vendors on both

10   the PayPal side and banking side that deals with the transfer

11   of the funds and the conversion, but I do know the money

12   eventually goes to a PayPal Hong Kong account, and the money at

13   issue here, all the accounts are Hong Kong PayPal accounts.

14   Whether or not there is one more intermediary before it hits

15   the defendant's PayPal Hong Kong accounts, I'm not sure of.

16   PayPal would know the answer to that.  But everything that's

17   being attached currently is a Hong Kong PayPal account.

18           THE COURT:  Mr. Dunnegan, have you attached --

19           MR. DUNNEGAN:  Well, your Honor --

20           THE COURT:  Have you attached, in effect, Hong Kong

21   bank accounts?

22           MR. DUNNEGAN:  Well, I don't think it is a Hong Kong

23   bank account.  When he says it's a Hong Kong PayPal account,

24   what he's saying is, the address that was used to open up the

25   account was in Hong Kong or China.  That does not make the

L1J1MATC

1   money that the US consumer pays not subject to US jurisdiction.

2   We have PayPal, which is located on the West Coast, telling us

3   that it has frozen $2.7 million.  If their answer was, oh, we

4   don't control that, that's some other Hong Kong entity, then

5   that would have been our answer from PayPal on the West Coast.

6   But it wasn't.  It was, we've frozen this money, and we admit

7   that we're subject to the jurisdiction in New York.  Now, your

8   Honor, this point wasn't made anywhere in their papers.

9            THE COURT:  Right.  It is news to me, but look,

10  Mr. Dunnegan, you have a $5,000 bond up, which there's no

11  relationship to the millions of dollars, you know, that have

12  been attached possibly, you know, improperly.  I don't know.

13           MR. DUNNEGAN:  Well, but that's --

14           THE COURT:  Something has got to be resolved.  Either

15  you're going to be asked to increase your bond or you're going

16  to have to figure out some way that some of their money is

17  released.  I mean, if you have succeeded in bringing them to a

18  total halt, that is disproportionate harm to the claim here.

19           MR. DUNNEGAN:  I totally understand, and that would be

20  a valid point if that were what in fact has happened.  Let's

21  take those one at a time.  In terms of the amount of the bond,

22  they haven't asked that it be increased.  If they --

23           THE COURT:  Well, I'm concerned --

24           MR. DUNNEGAN:  Yes, no, I understand that.

25           THE COURT:  -- all right?  I don't feel that that

L1J1MATC

1    $5,000 is remotely putting you, Mattel, at the potential risk

2    it ought to be, because right now, so you lose 5,000, you don't

3    care.  But you have to care a little more.

4            MR. DUNNEGAN:  Oh, I completely -- I don't disagree

5    with your Honor.  I don't disagree.  No one has raised that

6    issue.  I did not purport to address that.  It sounds to me

7    like that is a reasonable point to be made.  But that's not the

8    point that the defendants are making on this motion.

9            THE COURT:  Well, that may be, but it's my order.

10           MR. DUNNEGAN:  I understand.  I understand.  And look,

11   if your Honor determines that that bond should be increased,

12   that's your discretion, your Honor.  I'm not going to say that

13   we're going to give up this attachment rather than increase the

14   bond.  I mean, that's just the cost of doing business to meet

15   the requirements.

16           THE COURT:  I don't think that Mattel wants to put

17   millions of dollars on the table, possibly, over this doll.

18           MR. DUNNEGAN:  Well, here's --

19           THE COURT:  I mean, look, there's got to be some way,

20   on a temporary basis -- and I'm speaking to the defendants here

21   as well -- to create some real security for the plaintiff's

22   claim while we expeditiously figure out whether the attachment

23   is, in effect, effective or not, proper or not, what the

24   actual, realistic, you know, damages can be here.  I don't

25   object to working hard to figure out these answers quickly, but

L1J1MATC

```
 1    I do think there needs to be something in place which both
 2    permits the defendant to operate and the plaintiff to have some
 3    genuine security.
 4              MR. DUNNEGAN:  Your Honor, this is Bill Dunnegan.  May
 5    I ask one question.  I think I can cut through this.  Can the
 6    defendants tell us how much money at PayPal is not subject to a
 7    PayPal lien, meaning how much money could the defendants wire
 8    out of those 11 accounts this moment?
 9              MS. BURGHARDT KRAMER:  Well, your Honor, at this
10    moment the answer is none, because it's all frozen.
11              MR. DUNNEGAN:  But for the attachment.  You know what
12    I mean.
13              MS. BURGHARDT KRAMER:  But for the attachment, there
14    is -- as we say in the reply, there's a certain amount that
15    PayPal requires just as a standard part of --
16              THE COURT:  What's the percentage of the charges
17    through PayPal?
18              MS. BURGHARDT KRAMER:  I don't recall what the
19    percentage is.  The reserve amount I think is -- ballpark, I
20    think it's about 1.5 million.  Maybe.  I have to look back and
21    get a more precise number.  But essentially it's not a lien,
22    but it's a reserve amount that has to stay in the account.
23    There's a fixed amount that has to be paid in as a deposit, and
24    then there's the revolving amount that essentially just creates
25    a buffer so that if there's a charge-back, if there's a product
```

L1J1MATC

1   return, whatever, PayPal wants to make sure that there are

2   funds that are sitting there, but the money flows through.  So

3   that's the money that would -- my understanding is that that

4   money would still be required by PayPal -- even if these

5   certain accounts stay frozen and then other accounts become

6   operational again, that there would still be a deposit

7   requirement because PayPal needs to have that and they would --

8   then there would be some amount of money that would have to

9   stay even in the unfrozen accounts to give that buffer.

10          So all I'm hearing from the plaintiffs is a lot of

11  speculation about this idea of, you know, what if there are

12  liens.  We're offering to keep $2.8 million in these accounts,

13  which we say is an excessive amount of money based on where the

14  attachment order should end up.  We have excellent arguments,

15  in my opinion, about why the attachment should be completely

16  vacated.  Those issues are not yet briefed, but we have a

17  briefing schedule, and we intend to get all of that before the

18  Court by the end of this week.  We have arguments for why the

19  attachment should be vacated altogether.  As Jacob said, this

20  money is in Hong Kong.  It's outside the Court's jurisdiction.

21  We have other arguments as well.  In addition, if the Court

22  doesn't look favorably on those arguments, we have very strong

23  arguments for why 2.8 or, you know, a number like that is

24  excessively high.  And if there ends up being an attached

25  amount, it needs to be much, much, much, much lower than the

L1J1MATC

amount that we're saying for now, because that creates a

buffer, that creates a comfortable range that, you know, if we

give Mr. Dunnegan's speculation some credence and say maybe

PayPal has a small amount of a lien on this money, it's not

going to be the whole thing, maybe a tiny amount, and I don't

have any reason to think that there would be, but even

indulging in the speculation to say even if there was a small

amount subject to a lien, we still have plenty of buffer there.

We have plenty of buffer between the 2.8 and what the damages

would be in a case like this and where things may be going with

the attachment.

        So from our perspective, what we want -- sorry,

Jacob -- is to be able to resume operations.  There's no reason

to change the current procedure, change the current mechanism.

The money is safe with PayPal.  I have no reason to doubt that

PayPal's going to act honestly in this situation, hold the

money.  They'll hold the money.  It's just temporary.  It's

just temporary.  And then your Honor will have a chance to look

at this in a lot more depth once we submit our briefing and

once all the issues are aired.  We just desperately need to

resume operations, and are proposing to do so in a way that

still gives plenty of security for the plaintiff.  And I truly

don't hear anything from Mr. Dunnegan other than speculation

and kind of, you know, "what ifs" and a whole series of red

herrings.

L1J1MATC

1          And Jacob, please go ahead.

2          MR. CHEN:  Yes.  And one thing I do want to add, that

3     the only numbers that plaintiff has actually provided was a

4     figure of 500.  At $30 per doll, at 10 percent profit, we're

5     talking about 1500; at a hundred percent profit, we're talking

6     about 15,000.  So the amount that should be held really is in

7     between 1500 and 2.8 million.  But it's a lot closer to the

8     1500 than the 2.8 million.  So the idea that if $2.8 million

9     was held and it is not enough security is just simply not

10     supported by any of plaintiff's submissions to the record --

11          MR. DUNNEGAN:  Your Honor --

12          MR. CHEN:  -- other than speculation.

13          MR. DUNNEGAN:  Your Honor, can I respond for 30

14     seconds?

15          THE COURT:  Sure.

16          MR. DUNNEGAN:  I asked the question, how much money is

17     not subject to a lien and could be taken out.  I did not get an

18     answer to that question from defense counsel.  They're talking

19     about -- they use words like, "oh, not a lot," or, "plenty of

20     buffer," but there's no assurance whatsoever that they have

21     provided that PayPal doesn't have a lien on this entire amount.

22          THE COURT:  But what is the logic that they have a

23     lien on the entire amount?

24          MR. DUNNEGAN:  Because the logic is that under their

25     agreement, PayPal has to be sure that customers are not going

L1J1MATC

1    to immediately show up and have a refund, because if they

2    release the money from the defendant during a certain period of

3    time, which can be as long as 180 days, that PayPal is going to

4    have to give the money back to the customer and have no

5    recourse against the seller.  PayPal doesn't like that

6    situation.  They want to be holding the seller's money so if

7    they have to give a refund, PayPal is not out of pocket.  Now

8    we don't know the numbers, but --

9              THE COURT:  That's right.

10             MR. DUNNEGAN:  -- the numbers must be within the

11   control of the defendant.  The defendant must be able to look

12   at a statement from PayPal online at this moment and say, oh,

13   we are entitled to withdraw X dollars, okay?  That's the number

14   that I'm looking for.  And defendants are not providing it.

15   They're saying, well, we got to leave a substantial amount

16   there, but they're not providing any quantification that gives

17   us any assurance as to whether or not that's going to satisfy

18   any more than a nominal judgment.  I mean, worst case for the

19   defendant, if they want to resume operations and they're such a

20   substantial enterprise, they can post a bond for $2.8 million.

21             THE COURT:  But they're saying that that would give

22   you something that maybe you have absolutely no right to have.

23   They're saying that their putting money into a New York court

24   may affect their jurisdiction argument.  That's what they're

25   saying.

L1J1MATC

1          MR. DUNNEGAN:  Okay.  I didn't hear that raised before

2    today, but the bond would be -- the bond would be

3    conditioned -- they could write the bond in such a way that it

4    would satisfy us that it would be conditional upon the

5    attachment being valid.  I mean, if they want, if they say they

6    can run away with all of this money because they're in Hong

7    Kong and not the United States and the Court agrees with them,

8    well, maybe that's just the way it is.  But what I hear them

9    saying is that we have an uncertain amount of money that we're

10   entitled to right now and we want to grab whatever we can and

11   leave the plaintiff with some accounts where there's PayPal

12   liens on them, which may not be very much, if anything, to

13   satisfy a judgment, and that's not satisfactory to us, and I

14   don't think it should be to the Court.

15          THE COURT:  I don't find any of this satisfactory,

16   okay?

17          MS. BURGHARDT KRAMER:  Your Honor, if we're able to

18   resume operations, then there will be additional funds flowing

19   through which can then be held to satisfy any of these

20   extremely speculative liens that PayPal may have.

21          THE COURT:  But the problem is that on the one hand,

22   you're arguing that there's no money in the United States and

23   that's why the whole attachment is a worthless piece of paper.

24   That's your argument, right?  That's your argument about why

25   the attachment ought to be vacated.

L1J1MATC

1          MR. CHEN:  Yes, that's correct.  That's one of our

2   arguments about why the attachment must be vacated, because the

3   accounts are in Hong Kong.

4          THE COURT:  I got it.  So that means that your

5   position is that it doesn't matter how much money is in these

6   accounts.  None of it's really here.  There's nothing there

7   that provides any security to the plaintiff.

8          MR. CHEN:  Well, if the Court agrees that the accounts

9   are in Hong Kong upon the full briefing, then they're not

10  entitled to an attachment and therefore, they're just not

11  entitled to attachment, period.  The attachment would be, from

12  the beginning, not correctly issued.  And if the Court

13  disagrees that the account is in New York, then the amounts

14  that are in it is attached and will remain attached.  So they

15  shouldn't get a relief that they wouldn't be entitled to

16  anyway; and if they are entitled, then the relief that they

17  get, the attachment will protect their interests.  So reducing

18  the attachment from 5 million to 2.8 million doesn't put

19  plaintiff in a worse -- actual worse position; it just puts

20  them in the same position that they are, and then if they can

21  prove the accounts are in New York, then they have an

22  attachment of a sufficient amount, and then if they can't, then

23  putting a higher attachment will only give them more leverage

24  to, you know, put a lot of pressure on my client -- on our

25  client.

L1J1MATC

1          THE COURT:  Hold on one second.  Please just hold on

2     one second.

3          Sorry.

4          MS. BURGHARDT KRAMER:  Your Honor, I assume that any

5     order that the Court would issue would be without prejudice to

6     the plaintiff being able to file papers to increase the amount

7     of the attachment, correct?  So if they were able to find

8     additional information about, you know, the extent of the

9     liens, then they could pretty quickly -- we're talking about a

10    short time, a short-term period right now, between where we are

11    today and hopefully getting all of the issues briefed and

12    getting a decision on, you know, a fully aired-out discussion

13    of what's happening with the attachment.  Is there so much risk

14    to the plaintiff if we cut it off at 2.8 held in the PayPal

15    accounts today, without prejudice to the plaintiff being able

16    to argue that amount should be increased because, you know,

17    they can find some evidence that there's some amount of that

18    that has a higher-priority lien by PayPal, so that amount is

19    ephemeral for attachment purposes; it would be without

20    prejudice to them briefing that issue in relatively short

21    order.

22         THE COURT:  It does sound like there's going to have

23    to be some discovery from PayPal to clarify.

24         MR. DUNNEGAN:  I would agree with that, your Honor.

25         THE COURT:  The whole way that this works -- because I

L1J1MATC

1    surely don't know.  I don't even have a PayPal account.  So on

2    that point of jurisdiction, on the point of what reserves

3    PayPal has, just how it works.

4         All right.  One thought that comes to mind.  Given

5    really that much of what we're talking about is speculative,

6    both the facts and the legal arguments, Mr. Dunnegan, what if a

7    million dollars is released from the PayPal accounts to the

8    defendants to enable them --

9         MR. DUNNEGAN:  Your Honor, the problem is is that

10   there may not be more than a million dollars which is there.  I

11   mean, Ms. Kramer said earlier in the conversation that there

12   was a $1.5 million amount that had to be held there, and in

13   addition to that, there was a revolving amount.  So we don't

14   know what the revolving amount is.  So to say --

15        THE COURT:  Okay, okay.  But it's speculative, sir.  I

16   mean, you really don't want to be in the position of, if in

17   fact you are bringing a business to a halt, and possibly

18   improperly, and that the damages you're causing to the

19   defendant is far greater than the damage caused to the

20   plaintiff is not a good situation.  I mean, you know that

21   businesses are allowed to continue to operate even in the

22   context of litigation, right?

23        MR. DUNNEGAN:  Absolutely, your Honor.  Absolutely.

24        THE COURT:  And it is just not a realistic scenario

25   that in fact there's really no money there at all, that it's

L1J1MATC

1    all really subject to, you know -- that's already all spoken

2    for, both by PayPal and by customers.

3                MR. DUNNEGAN:  Okay.  Your Honor --

4                THE COURT:  That's not a good business model.

5                MR. DUNNEGAN:  First of all, your Honor, the answer to

6    that question would lie solely within PayPal or the defendant,

7    and the defendant isn't telling us the answer.  If the answer

8    is there is something left, let's get the amount which

9    defendants can put in a -- wire into the court or put in a

10   segregated account somewhere so that we know, rather than take

11   a guess, that these substantial amounts of money are going to

12   be able to, you know, secure a judgment that comes down the

13   road.  I mean, right now the defendant has information, they're

14   not telling it to us, they're saying, we're out of business,

15   even though they're not, and they're saying, oh, let us take a

16   million, you know -- the suggestion has been made to take a

17   million dollars out of these accounts, hand it to defendants,

18   and there's no assurance that there is anything else there

19   beyond -- I mean --

20               MR. CHEN:  Your Honor, plaintiff really has the cart

21   in front of the horse.  Pretty much they've just admitted that

22   they don't actually know.  They're just really making stuff up

23   and telling the Court, well, we don't know anything and

24   therefore you should attach all the accounts of defendants.  I

25   don't think PayPal even really honestly knows.  I don't think

L1J1MATC

1    they can produce you a number arbitrarily about how much

2    potential lien there is.  Again, this is entirely plaintiff's

3    speculation.  They don't have an affidavit from PayPal saying

4    that there's some amount of money that has to be held.  They

5    don't have an affidavit from PayPal saying any amount of money

6    has to be held.  They're basically saying, maybe this money has

7    to be held, we don't really know, and we just want the Court to

8    issue an attachment anyway.  If the Court reduces the

9    attachment and plaintiff can get discovery that shows that they

10   actually have some legitimate grounds for a specific amount,

11   they can go back to the Court and seek an adjustment.  But

12   until then, the Court should not entertain plaintiff's

13   speculation about the amount and shift the burden, which is on

14   the plaintiff, to PayPal or defendant or any other party when

15   plaintiff bears the burden of putting to the Court evidence to

16   support the relief that they are seeking.

17          New York case law makes it very clear that with

18   respect to the issue of an attachment, it is the plaintiff, the

19   moving party, plaintiff that bears the burden, a heavy burden,

20   of providing the evidence in favor of the attachment.  And the

21   amount.

22          And I'd be happy to cite the case law if the Court

23   would like, and of course this will be mentioned in much more

24   detail in our opposition papers, but I could give them to the

25   Court now, which shows that under New York case law, which the

L1J1MATC

1    federal court follows with respect to an attachment under New

2    York law, it is the plaintiff that bears the burden of proof

3    and the evidentiary burden of proof in support of the

4    attachment.

5         MR. DUNNEGAN:  Your Honor, there's another fact that I

6    dug up on the PayPal statements after the issue of reserve

7    account was raised, and I'm looking at the account, the PayPal

8    account which is under the email address yougoodplus@163.com,

9    and the amount that PayPal told us that was restrained in that

10   account was $1.372 million and change, and then when I look

11   farther on the same spreadsheet, there's a column which says

12   Rolling Reserve Balance, and the amount in that column is

13   $1.174 million.  So of that, what appears to be, if I'm reading

14   this correctly -- and I haven't had anybody from PayPal tell me

15   what this means -- it appears there would be roughly 150 to

16   $180,000 in that account, which appears to have $1.3 million in

17   it.

18        MR. CHEN:  I think what it meant was that because of

19   the Court's order, this is how much they're holding, this is

20   how much money is coming into the account, so that's probably

21   the difference between the amount of money that is already in

22   the account and is held and the amount of money that is coming

23   into the account and that will be held once the money enters

24   into the account.  But also, as plaintiff's counsel admits,

25   they don't actually know.  They have not sought discovery.

L1J1MATC

1    They have not obtained any information from PayPal in support

2    of their speculation about what lien PayPal may or may not have

3    and the priority of that lien, if it exists.  They have not put

4    in any papers to show that PayPal has some prior lien over the

5    Court's judgment or that they have any real ability to simply,

6    like, take the millions of dollars in the account in the case

7    that the Court issues an attachment and in the case that

8    plaintiff does ultimately prevail.  In fact, the only thing

9    they've shown is that PayPal is willing to do whatever it is

10   that the Court orders, and if the Court orders the attachment,

11   PayPal has shown no indication or willingness to take or touch

12   any of the attachment.

13           MR. DUNNEGAN:  Your Honor, I'm not sure I understood

14   that, but I think I have two points.  One is that the acid test

15   to determine whether or not PayPal is actually asserting a lien

16   on these amounts is to see how much money that the defendants

17   can withdraw from PayPal if PayPal was directed to, pursuant to

18   Court order, to move the funds somewhere else.  I suspect it's

19   not going to be a tremendously substantial amount of money and

20   it's not going to be anything close to $5 million.

21           The second point I wanted to make is, there's a reason

22   that there's $5 million of the defendant's money at PayPal.

23   The defendants are not deciding, gee, let's earn no interest on

24   this money and let it sit at PayPal for the fun of it.  That

25   money is -- I mean, I don't know what's happened in the last

L1J1MATC

two weeks, but money is sitting at PayPal, the inference is, to
me, that's because it's got to sit at PayPal because PayPal
won't release it.  I mean, nobody lets money sit in a bank --
PayPal is essentially a bank -- interest free when they could
take it out and earn some money on it.

        MR. CHEN:  Again, this is just what plaintiff's
counsel imagines.

        THE COURT:  But the problem, Mr. Dunnegan, is that
this is all speculation, and the defendants are saying, because
of this attachment, you've shut down their business.

        MR. DUNNEGAN:  Okay.  If I may --

        THE COURT:  And that's a serious matter, which you
should be concerned about, because, you know, we had all this
conversation about 2.8, but that is a number that is the
highest possible number that you would ever recover here.  So,
you know, it's one of these things where it's this psychology
of, you know, you pick a number and then all conversation sort
of -- it's like the sentencing guidelines.  They're very high,
so it kind of gets you to focus at a high number, which may be
a totally unrealistic number, or unfair number.  And that's
what's sort of going on here.  You have everybody thinking
about 2.8, which makes every assumption in your favor, which
may be a phenomenal multiple of the either actual harm to
Mattel or actual sales and --

        MR. DUNNEGAN:  Your Honor, for purposes of this series

L1J1MATC

1    of letter motions, they conceded 2.8 was their number.  We

2    agreed with them for purposes of these series of motions.  The

3    only thing we're really debating now is whether or not -- well,

4    one, is there really $2.8 million in these accounts.  I have my

5    doubts, because I see PayPal asserting liens on them and I see

6    sophisticated defendants leaving money interest free.  Doesn't

7    make sense.  I think the defendants can't get that money out

8    because PayPal is asserting liens against it.  Now the simple

9    way to do it is to take some of that PayPal money and move it

10   somewhere else, whether it's the court or an escrow account at

11   some mediation service or some law firm.  But the idea that

12   we're just going to whack off some amount of this money because

13   the defendants are telling us that their client is so big that

14   they'll be able to pay any judgment rendered in this case when

15   they can't get through ten days or two weeks without paying

16   their suppliers, just does not seem to me like it is making

17   sense.  I mean, the order doesn't require them to stop doing

18   business.  They can put all they want into those accounts

19   despite the temporary restraining order.  It only deals with

20   taking money out of it.  And the concept or the idea that they

21   can't get by since January 7th until today without taking money

22   out of their PayPal accounts is just not credible.

23           THE COURT:  Well, I don't know why that's --

24           MS. BURGHARDT KRAMER:  Your Honor, if I may, if I may,

25   the restraints that have been ordered by the Court also

L1J1MATC

1  prohibits accepting funds into the PayPal account.

2           MR. DUNNEGAN:  I don't see that.  I don't see that,

3  Katie.  Temporarily restrained from transferring, withdrawing,

4  or accepting any funds -- that means the defendants accepting

5  any funds -- from any defendant at PayPal.  Certainly there's

6  no intent to prevent them from adding any amount to this

7  account.

8           THE COURT:  All right.  Here, you each have a task,

9  because I really find this -- I don't know -- distressing.

10  Maybe that's the wrong word.  Frustrating is the better word.

11  Mr. Dunnegan, you've done nothing to really learn from PayPal

12  what's truly in the accounts and available for attachment.

13  Similarly, the defendants haven't told me anything about what

14  part of the PayPal accounts are available for possible judgment

15  and whether, you know, there are restrictions preexisting the

16  attachment.  So tomorrow, as early as you can, hopefully, early

17  afternoon -- well, actually, it's a terrible day, because we

18  really all should be watching television tomorrow.  But as soon

19  as you can, get me some information, and if I don't have that

20  information, I'm not comfortable, Mr. Dunnegan, I am not

21  comfortable, because someone advertised, you know, Mattel

22  dolls, whether they were a knockoff or the real thing, for 30

23  something dollars, that that is going to harm Mattel in a way

24  that is so severe that we ought to put the defendants out of

25  business.  Whether they're right or wrong -- they could be

L1J1MATC

1    totally wrong --

2              MR. DUNNEGAN:  Your Honor, may I --

3              THE COURT:  -- it's disproportionate.  It really is.

4              MR. DUNNEGAN:  Okay.  Now dealing with the issue --

5    I'm sorry.  Go ahead.

6              THE COURT:  And you don't want, you shouldn't want,

7    the responsibility for doing that.  It's disproportionate.

8              MR. DUNNEGAN:  That I would be happy to take, your

9    Honor.  But --

10             THE COURT:  You really don't want to.

11             MR. DUNNEGAN:  With respect to the issue of what

12   information we can get out of PayPal, I have a feeling that if

13   I call them up and I say, what is the amount of the lien that

14   you're asserting, that they're not going to tell me.  Now --

15             THE COURT:  Then you're going to be stuck with what

16   you're saying is speculative.  The defendants are not giving me

17   any hard evidence either.  You're going to leave me in the

18   position where the only thing I'm going to feel comfortable

19   doing is releasing a bunch of the money so that the defendants

20   can continue in business, because I'm not going to want the

21   responsibility for putting them in severe straits, given what

22   is at stake in this case.

23             MR. DUNNEGAN:  Okay.  May I serve a subpoena on PayPal

24   which is returnable in a couple of days?

25             THE COURT:  No.  Yes, you can, but that's not going

L1J1MATC

1   to -- I think this problem has to be resolved sooner than that.

2           MR. DUNNEGAN:  Sooner than Friday?

3           THE COURT:  Yes, sooner than Friday.

4           MR. DUNNEGAN:  Wow.

5           THE COURT:  You know, you struck it rich here, you

6   thought.  I mean, the point is that --

7           MR. DUNNEGAN:  Did I?  But see --

8           THE COURT:  I don't know.

9           MR. DUNNEGAN:  -- if I don't know the amount of the

10  liens and I can't get it in a subpoena which is returnable in a

11  couple of days --

12          THE COURT:  Why don't we also have the defendants

13  disclose to us how many dolls they actually sold, okay?  Why

14  don't we learn that too.

15          MR. DUNNEGAN:  I think that's a great idea.

16          THE COURT:  All right?

17          MR. DUNNEGAN:  That's fine.  But I think --

18          THE COURT:  And they can tell me tomorrow.

19          MR. DUNNEGAN:  But I think the defendants can also

20  look at their account and see how much is capable of being

21  released.  I am very sure of that.

22          MS. BURGHARDT KRAMER:  Your Honor, I think we need

23  some clarity here, and maybe this is information that we can

24  provide tomorrow, maybe we can get this from PayPal, some

25  clarity on the terms "reserve" versus "lien," because what I'm

L1J1MATC

```
 1    hearing from Mr. Dunnegan sounds to me like there may be some
 2    conflation in his mind between a lien and a reserve.  So my
 3    understanding of a lien is an amount that PayPal says, we get
 4    this money.  A reserve is our money; we just don't get it
 5    today.  We get it in some period of time.  It needs to sit
 6    there, but it's our money.  There's no lien on it.  It's
 7    just -- it needs to sit there so there's a cushion.
 8                THE COURT:  Right.
 9                MS. BURGHARDT KRAMER:  So I don't know if we need to
10    put in --
11                THE COURT:  That distinction seems reasonable to me
12    that --
13                MS. BURGHARDT KRAMER:  And some of this information
14    about PayPal's requirements for reserves, they have some of
15    this information available on PayPal's own website about
16    reserves, and it's clear that it's not -- the reserve doesn't
17    mean PayPal has a lien on that amount.  It just means PayPal
18    says, if you're going to do business here, you need to have a
19    cushion in your account.  You'll get the money.  It's your
20    money.  You just don't get it today.  You get it in -- whatever
21    it is -- 30 days, 90 days, something like that.
22                MR. DUNNEGAN:  Well, your Honor, I think it's a
23    cushion in the event that no consumers assert a claim against
24    it.  I mean, PayPal isn't requiring cushions for no purpose
25    whatsoever.
```

L1J1MATC

 1          THE COURT:  But, look, in a totally legitimate

 2   business, you can still have returns.

 3          MR. DUNNEGAN:  Agreed.

 4          THE COURT:  I mean, and the point is that I'm sure

 5   that, whether it's PayPal or it's Amazon, they, over time, know

 6   the metrics of what is the likely percentage of returns, or

 7   whether it's Bloomingdale's, whoever, and that would create

 8   what Ms. Kramer describes as a reserve.  That seems like a

 9   reasonable business model.

10          MS. BURGHARDT KRAMER:  And your Honor, what I'm

11   concerned about is that I don't want the plaintiff to conflate

12   those two ideas and say whatever amount is held in reserve is a

13   lien, because it's not.  It's not a lien.  It's our money.  We

14   just -- it's in reserve for right now because there's some

15   possibility of some returns, some charge-backs, whatever, but

16   it doesn't mean that that full amount goes poof or it doesn't

17   mean that it's actually going to go to PayPal.

18          MR. CHEN:  And by all accounts, if it's a reserve, a

19   judgment would take priority over a reserve, and there's --

20   plaintiff made no allegation that there's a lien on the money,

21   just simply that PayPal is holding a reserve, which is the

22   amount of money which the client can't withdraw but --

23          THE COURT:  I understand.  But by tomorrow we can get

24   a lot of clarity on the reserve policy, on what type of sales

25   of this doll we are really talking about, which would give us

L1J1MATC

1    some kind of reality check, but as I say -- I'm being perfectly

2    candid with you -- I am not comfortable with the notion that,

3    given the nature of the claim here, that the risk of causing

4    very serious damage to a going concern is proportionate.  So

5    get me some more information --

6             MR. DUNNEGAN:  Yes.  And your Honor --

7             THE COURT:  -- and then I can make a more informed

8    judgment.

9             MR. DUNNEGAN:  Now in terms of getting back to your

10   Honor, how would you like us to do that?

11            THE COURT:  File on ECF.

12            MR. DUNNEGAN:  A joint letter or separately or --

13            THE COURT:  No.  I don't expect you to agree on the

14   letter.

15            MR. DUNNEGAN:  Okay.

16            THE COURT:  Get me information.  I think you know what

17   we're talking about.  And look, there isn't any question that

18   if some amount is staying at PayPal, it has to be clear that it

19   is available to satisfy a settlement or judgment.  I mean,

20   otherwise whatever is left there for this purpose, what remains

21   attached has to really be available and can't, poof, go away.

22            MS. BURGHARDT KRAMER:  Your Honor, we are in the

23   process of compiling the numbers.  We had planned to submit all

24   of this on Friday once we have -- once we were planning to put

25   everything in at that point, and we'll put in -- we'll plan to

L1J1MATC

1    put in the specific numbers tomorrow.  The numbers that I have

2    at this point are that the profits to our client from the sale

3    of the dolls is less than a hundred thousand.

4               THE COURT:  Less than what?

5               MS. BURGHARDT KRAMER:  A hundred thousand.  The

6    profits.  The profits; not the total sales number.

7               THE COURT:  Okay.

8               MS. BURGHARDT KRAMER:  The profits.

9               MR. DUNNEGAN:  What would be the total sales number?

10              MS. BURGHARDT KRAMER:  I need to double-check the

11   numbers.

12              MR. DUNNEGAN:  Ballpark.

13              MS. BURGHARDT KRAMER:  Ballpark, around 700,000.

14              MR. DUNNEGAN:  Wow.

15              MS. BURGHARDT KRAMER:  That's revenue, 700,000.

16              MR. DUNNEGAN:  $700,000 of "Day of the Dead" dolls?

17              THE COURT:  I wouldn't buy one.

18              MS. BURGHARDT KRAMER:  That's the information that I

19   have.  This should bring us into --

20              MR. DUNNEGAN:  That's substantially different than the

21   15 or $30,000 that Mr. Chen was talking about earlier.

22              MS. BURGHARDT KRAMER:  Well, we were talking about the

23   numbers that you were putting out there, Mr. Dunnegan.

24              MR. DUNNEGAN:  My numbers were just what was taken

25   from your website.

L1J1MATC

1        MS. BURGHARDT KRAMER:  Right.  And we didn't mean to

2   suggest that there actually were 500 sales.  We were

3   piggybacking off of what you were saying.

4        MR. CHEN:  I think the records show that there were

5   500 sales in New York State, and the remaining sales were other

6   places in the United States.

7        MR. DUNNEGAN:  Well, your Honor, those numbers are

8   larger, substantially larger than what I expected, for what

9   it's worth.

10        MR. CHEN:  But also substantially smaller than -- if

11   the Court were to take into consideration the profits that were

12   made on each sale, that comes far short of the 2.8 million.

13        MR. DUNNEGAN:  Agreed.

14        MS. BURGHARDT KRAMER:  And what we're talking about

15   here -- and we'll put all of this into a filing with the Court

16   tomorrow -- we're talking about a really short time period when

17   this product was offered for sale.  It was offered for sale for

18   a very short time period and then it was actually -- Yokawa had

19   pulled the product.  So they ceased the sales.  It's no longer

20   being sold.  So there is no risk of any sort of ongoing sales.

21   We have a fixed period of time that this product was being

22   sold, and a pretty short period.

23        MR. DUNNEGAN:  And if I may, you're not disputing that

24   these were either nonexistent products that were never

25   delivered or counterfeit; is that a fair statement?

L1J1MATC

1          MS. BURGHARDT KRAMER:  I'm not stating that at all.

2          MR. CHEN:  That were delivered.  With the exception

3     of, in your case, I think that was after, when the client

4     stopped selling of the goods.

5          MS. BURGHARDT KRAMER:  To be clear, we do intend to

6     fully defend the case on the merits.

7          MR. DUNNEGAN:  So is it your position that you were

8     selling legitimate Mattel products to the tune of $700,000?

9          MS. BURGHARDT KRAMER:  No.  We were selling dolls.

10          THE COURT:  Which on your website you described as

11     Mattel dolls?

12          MS. BURGHARDT KRAMER:  No.  We didn't use the word

13     "Mattel."

14          MR. DUNNEGAN:  Barbie.

15          THE COURT:  Barbie.  I'm sorry.  But which you

16     described as Barbie dolls?

17          MS. BURGHARDT KRAMER:  In a couple of places.

18          MR. CHEN:  Basically the situation is --

19          THE COURT:  Mattel owns the trademark.

20          MR. CHEN:  Basically the situation is, our client's

21     internal processes did not -- because they're not United States

22     based, they're Hong Kong based, they didn't realize that Barbie

23     was a infringing statement.  They thought Barbie was in the

24     generic, which, you know, doesn't change the fact that what

25     they did was to the point where they stopped selling the

L1J1MATC

1    products when that came to their attention.  But when they

2    initially started selling it, for just a short period of time,

3    they didn't know that it was -- they didn't intend to infringe.

4    They simply -- they thought they were selling the generic

5    Barbie dolls.  They didn't intend to sell specifically Mattel

6    Barbie dolls.

7            THE COURT:  Didn't the dolls that you sold look

8    identical to the ones that Mattel sells?

9            MR. CHEN:  I think the manufacturer -- they approached

10   the manufacturer for pictures and the manufacturer gave them

11   pictures.  Whether the manufacturer took the pictures

12   themselves or took the pictures off Mattel's site, our client

13   is looking into, but at the time when they published it, they

14   had no idea that Mattel had the "Day of the Dead" Barbie dolls.

15           THE COURT:  I'm not sure I follow that, but I'm sure

16   you'll try to clarify that.

17           MR. CHEN:  Yes, and we --

18           THE COURT:  Just by happenstance they just came upon a

19   "Day of the Dead" doll, called it a Barbie, but didn't have any

20   idea --

21           MR. CHEN:  I suspect that --

22           THE COURT:  -- that Mattel sells a "Day of the Dead"

23   Barbie doll?

24           MR. CHEN:  I suspect that the manufacturer who pitched

25   the idea might have known that it was infringing, but our

L1J1MATC

1    client did not.

2              THE COURT:  Was the manufacturer the same guy who

3    makes the dolls for Mattel?  Mattel will be interested in

4    knowing that.

5              MR. CHEN:  Yeah, absolutely.

6              THE COURT:  And it might help you in resolving this

7    case to let them know who the manufacturer of your dolls was so

8    that they might take their ire out on the manufacturer and make

9    sure that they don't give him any more business because he's

10   gone behind their back and, in the vernacular, screwed them.

11             MR. CHEN:  It wouldn't surprise me if that was the

12   case.  We told our client to get as much information --

13             THE COURT:  It wouldn't surprise me either.

14             MR. CHEN:  -- on the manufacturer as possible.

15             THE COURT:  Okay.

16             MS. BURGHARDT KRAMER:  Certainly in due course we

17   expect that we'll get into all of this in more detail.  The

18   immediate question was how many products we're talking about,

19   what are the lost profits here, what are the actual profits.

20             THE COURT:  And the other thing is, we need to get

21   some clarity on what money that's in the PayPal accounts is

22   really available, and if it turns out to be a really solid

23   number, we'll leave it at the attachments on the assumption

24   that PayPal knows better than to violate a federal court order.

25             MR. CHEN:  They've already shown that.  I think PayPal

L1J1MATC

1    has --

2              THE COURT:  They seem to be, yes.

3              I look forward to receiving stuff from you as early

4    tomorrow as possible.  Okay?

5              MS. BURGHARDT KRAMER:  Certainly.

6              THE COURT:  Okay, guys.

7              MR. DUNNEGAN:  Thank you, your Honor.  Thank you very

8    much.

9              THE COURT:  Okay.

10             MR. CHEN:  Thank you, your Honor.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25